# CIRCUIT COURTS OF ILLINOIS.

(*Circuit Court of Cook County. In Chancery.*)

## Francis W. Dunbar, et al.

vs.

## American Telegraph & Telephone Company, et al.

(1908.)

1. RES ADJUDICATA—VIEWS OF SUPREME COURT BINDING ON LOWER COURT AFTER REMANDING. Where a case is reversed and remanded by the supreme court with directions to proceed in conformity with the views expressed in the opinion of the Supreme Court, such views are *res adjudicata* and binding on the lower court as to the law in so far as applicable to the evidence.

2. CORPORATIONS—POWER TO HOLD STOCK IN OTHER COMPANIES—PURPOSE OF. If one corporation becomes the purchaser of the stock of another corporation with the unlawful purpose and intention of putting the latter corporation out of business, or so using and controlling it as to prevent rivalry in business and creating a monopoly, such purchase is illegal and void and against the public policy of Illinois.

3. SAME—PURCHASE IN NAME OF THIRD PERSON. The legality of the transaction is not aided by making purchase in the name of third persons.

4. SAME—COMPLETE MONOPOLY NOT NECESSARY. To invalidate the purchase by one corporation of stock in another corporation for the purpose of suppressing competition or creating a monopoly, it is not essential that a complete monopoly or a complete restraint result. It is sufficient that the tendency be in that direction.

5. FOREIGN CORPORATIONS—POWERS TO HOLD STOCK IN ILLINOIS COMPANY. Foreign corporations are subject to all the regulations provided by the laws of the state as to domestic corporations

1

and consequently cannot purchase or hold stock in domestic corporations where a domestic corporation could not.

6. CORPORATIONS—PURCHASE OF STOCK IN OTHER CORPORATIONS—PURPOSE NOT MATERIAL WHERE TENDENCY IS TO SUPPRESS COMPETITION OR CREATE A MONOPOLY. Where the purchase by one corporation of stock in another corporation has a *tendency* to create a monopoly or suppress competition the *purpose* of the purchaser in making the purchase is not material. In other words, it is not necessary in order to invalidate the transaction that the purpose *and* the tendency be the same.

7. MONOPOLIES—POWER TO DISSOLVE COMPETITOR TENDS TO CREATE. Where the purchase by one corporation of the stock of a competitor gives the purchasing corporation absolute control and empowers it to wind up such competitor, the tendency of the transaction to suppress competition and to create a monopoly is apparent.

8. JUDICIAL NOTICE—FACT THAT LARGE CORPORATIONS OR INTERESTS SEEK TO ABSORB OR OVERCOME COMPETITORS. The court should not ignore the well recognized fact throughout the business world that with rare exceptions the persons who control large corporations or business interests are on the lookout continually to absorb or overcome their competitors in trade.

9. CORPORATIONS—ULTRA VIRES—PURCHASE OF STOCK OF DOMESTIC CORPORATION BY FOREIGN CORPORATION. It would seem that under the decisions of the supreme court of Illinois and section 26 of the corporation act that the purchase of the majority of the stock of a domestic corporation by a foreign corporation is *ultra vires.*

10. EQUITY PLEADING—NOT NECESSARY TO ALLEGE TENDENCY OF ACTS CHARGED. When the facts upon which the relief asked is based are alleged in the bill it is not necessary to allege the *tendency* of such acts.

11. CORPORATIONS—SETTING ASIDE PURCHASE BY CORPORATION OF STOCK OF COMPETING CORPORATION—CONDITIONS OF RELIEF. Where the purchase by one corporation of the stock of a competing corporation is set aside, the court should restore, so far as possible, the conditions existing before the time of the purchase. The purchaser should be required to return the stock and the dividends paid thereon with interest on the amount of such dividends. The sellers of the stock should be required to return the purchase price with interest thereon. If the sellers fail to return such purchase price, the stock should be sold and the proceeds to the extent of the original purchase price and interest should be paid to the original purchaser.

Bill, amended and supplemental and cross-bill. The facts are stated in the opinion and in the opinion of the supreme court in the same case, 224 Ill. 9. Heard before Judge Thomas G. Windes.

*Henry S. Robbins,* for Francis W. Dunbar.

*Charles H. Aldrich & Henry S. McAuley,* for Kempster B. Miller and George L. Burlingame.

*John S. Miller & Pliny B. Smith,* for Milo G. Kellogg.

*Hon. A. N. Waterman* and *Holt, Wheeler & Sidley,* for American Telephone & Telegraph Co., Western Electric Co. and Enos M. Barton.

*Tenney, Coffeen, Harding & Wilkerson,* for certain other parties.

WINDES, J.:—

The bill in this case was filed on the fifth of June, 1903, by certain minority stockholders of the Kellogg Switchboard and Supply Company, representing about 370 shares of the stock of the par value of $100, against the American Telephone and Telegraph Company, a New York corporation, the Western Electric Company, and the Kellogg Switchboard and Supply Company, the latter two being Illinois corporations; also certain officers of these defendant corporations, and the remaining stockholders, as I understand it, of the Kellogg Switchboard and Supply Company, that are not complainants in the case. The court will refer to these three corporations as the American Company, the Western Company, and the Kellogg Company, respectively, so as to save a few words.

Stating the case generally, the principal purpose of the bill was to have declared void and set aside a sale of certain stock of the Kellogg Company by several of its stockholders to a defendant, Mr. Barton, the stock being taken in the names of the defendants Barton and Baker, but taken for the American Company, as I believe is conceded. Certain other specific relief is asked by the bill, beside the setting aside of the contract, and it also asks for general relief. After the filing

of divers demurrers on the part of different defendants, and answers to the original bill, the filing of an amended bill, a supplemental bill and a cross-bill by the defendant, Milo G. Kellogg, and of demurrers and answers and amendments to these answers by different defendants, to the amended and supplemental bill, and the cross-bill, respectively, the demurrers were sustained, and the several bills dismissed for want of equity by decrees entered by Judge Mack some three years and a half ago. These decrees were sustained on appeal to the branch appellate court, but on further appeal the decree dismissing the amended and supplemental bills was reversed by the supreme court, though the court in its opinion says the demurrer is sustained to the original bill, and the cause was remanded with directions to proceed in conformity to the views of the supreme court. The decree dismissing the cross-bill was affirmed by the supreme court. Since that decision of the supreme court the issues were made up on the amended and supplemental bills in conformity to the supreme court decisions, and after the hearing had commenced in the case a further supplemental bill was filed, on which issues were made during the progress of the hearing. To state the details or even the substance of all these pleadings would take unnecessary time, and it would be needless in view of the conclusions that the court has reached. I will endeavor to make it as condensed as I can.

The evidence, which took some four weeks to hear, among other things which the court deems unnecessary to be stated, shows that the Kellogg Company was organized in 1897, and ever since has been operated as a manufacturing corporation, manufacturing telephone switchboards and telephone apparatus in Chicago. It has been a very successful and prosperous corporation, up to the latter part of 1901, when its president, and the active manager of the corporation, the defendant Milo G. Kellogg, who was the owner of a large majority of its stock —as I remember about 3,300 shares of the total of 5,000 shares of the capital stock—was compelled on account of the very extreme ill-health in the latter part of November, 1901,

to leave all business and go to California for an indefinite time, the prospect then being, as is quite clearly shown by the evidence, I think, that he might not be able to resume active business again for a long period, if at all. Mr. Kellogg, on leaving for California, left practically all his private business matters and property in charge of and under the management of the defendant, Wallace L. DeWolf, who is his brother-in-law; and Mr. DeWolf, who was also a stockholder and vice president of the Kellogg Company, then took the active management of that company on the 16th of November, 1901, in place of Mr. Kellogg. Mr. Kellogg was an expert of very long experience in the business of manufacturing telephones and telephone apparatus, and in their installation, and was also a patent expert in the same line. Mr. DeWolf was a lawyer by profession, and had, for quite a number of years prior to this date, and including 1901, been engaged in the real estate business in Chicago, though he was without any practical experience as a manufacturer of, or in the installation of, telephones or telephone apparatus, nor does it appear that he had any experience with patents.

The Kellogg Company, though its business had been quite prosperous, had up to this time paid no dividends, and the management tentatively had arranged a short time prior to Mr. Kellogg's leaving for an increase of its capital stock, and the sale of the same to different stockholders, and I believe some others—I am not sure about that—in order to meet the necessities of the company's then contemplated expansions in its business, as well as its financial difficulties, by reason of the apprehended failure of one of its principal customers, referred to in the evidence and arguments of counsel as the Everett-Moore Syndicate, that Syndicate being then indebted to the Kellogg Company about $275,000, which was largely in the form of short-time notes that had been discounted at different banks by the Kellogg Company, to the amount of about $220,000.

Soon after Mr. Kellogg left for California this syndicate failed to meet certain of its discounted notes as they matured,

and they had to be paid by the Kellogg Company. The question then as to the failure of the syndicate at once became very important to the Kellogg Company and Mr. DeWolf, after a suggestion to him of the sale of Mr. Kellogg's stock in the Kellogg Company, and the suggestion of the name of the defendant, Enos M. Barton, as a possible purchaser of that stock, by Leroy D. Kellogg, a son of Milo Kellogg, and after discussing the situation with him—I refer to Leroy D. Kellogg, who was then, too, the secretary and treasurer of the Kellogg Company—commenced negotiations with Mr. Barton for the sale of the stock of his father, in order to raise money to meet the financial situation of the Kellogg Company. These negotiations commenced—it is not definitely fixed when, but I think the preponderance of the evidence is that they commenced at least early in the month of December, 1901, and extended through the remainder of that month, and up to January 4, 1902.

Mr. Barton was then the president and had the active management of the defendant, the Western Company, which was a competitor in business of the Kellogg Company, located in Chicago, and engaged in the manufacture of electrical apparatus and supplies, telephones, telephone apparatus, and their installation, but mainly for the American Company and its licensees or lessee companies. The relations of the American Company and the lessee companies will be more definitely referred to later. It also was then operating a large manufacturing plant in New York, engaged in a similar line of business. The American Company at this time owned and still owns more than sixty per cent of the capital stock of the Western Company, and also a. majority of the stock of numerous local telephone corporations in different parts of the United States, as well as a minority of the stock in many other like telephone corporations, throughout the United States, all of which local telephone corporations had licenses from the American Company, and are known throughout this case, in the evidence especially, as licensee or lessee companies. These last named companies constituted a part of the

system of telephone business of the American Company practically, which extends throughout this whole country and is referred to in the evidence and the pleadings, in connection with the American Company and the Western Company, as the "Bell System," the "Bell interests" and the "Bell Telephone Monopoly," though it is quite clear that it is not a complete monopoly.

The American Company at this time had an authorized capital stock of $150,000,000 and had outstanding stock issued to a very large number of stockholders, to the amount of nearly $120,000,000. Its authorized capital during the year 1907 was increased to $250,000,000 and it had stock actually issued during last year to the amount of about $150,000,000.

The American Company is, and has been ever since its organization, engaged in what is known as long distance telephone service throughout the United States, and in connection with its lessee companies, as well as other telephone companies in no way connected with it, and with the exception of the business done by what are referred to in the pleadings and in the evidence as the Independent telephone companies or system, does all the long distance telephone business in the United States; and it is also referred to in the evidence of its president, the defendant Frederick T. Fish, as a stockholding corporation, evidently because of the large amount of stock that it owns in its licensee companies above referred to.

I think it clearly appears from the preponderance of the evidence that the American Company has a practical monopoly of the telephone business in a very large part of the United States, and its competition with other corporations known as the Independent telephone companies, engaged in that business in many parts of the United States, was at the time of the sale of the stock in question, and for several years before that sale, quite a strenuous competition, and in some instances the witnesses put it as a "bitter" competition. There was such competition between the Bell interests and the independent companies at this time, in the court's opinion, it being estab-

lished by a preponderance of the evidence, as I have stated, and it is practically admitted by some of the defendant's witnesses, Mr. Dommerque, Mr. DeWolf and Mr. Barton; and this competition is also shown by the evidence of the president of the American Company, Mr. Fish, who was called as a witness on behalf of the plaintiffs.

During the whole existence, up to January 4, 1902, of the Kellogg Company, it was the principal manufacturer in the United States of telephones, telephone switchboards and telephone apparatus and supplies for these independent companies. The next largest manufacturer in that line in the United States was a corporation known as the Stromberg-Carlson Telephone Manufacturing Company, and which will be referred to hereafter as the Stromberg-Carlson Company. Another leading manufacturing corporation in that line, in January, 1902, was the American Electric Telephone Company. These three last named corporations were the only ones then manufacturing multiple switchboards for independent companies in the United States, which up to January, 1902, was the principal part of the business of the Kellogg Company. The Western Company at this time was largely engaged in manufacturing for the American Company and its licensee companies. In January, 1902, there were about four thousand telephone operating companies in the United States, and organized in many of the states, into state associations, and there was also a National Association, which included about that number, and they were in no way connected with the Bell interests except their lines in some instances operated together, and these independent companies purchased their supplies largely from the Kellogg Company, and the other two independent manufacturing corporations above referred to. They, including the manufacturing companies, represented an investment in 1902, of about $150,000,000. In 1907, the number of these independent telephone companies had increased to about seven thousand in the United States, and about that number was included in the National Association of the independent companies. But what their invest-

ment was in 1907 does not appear from the evidence, so far as the court could discover. Divisions 2 to 11, both inclusive, of the complainants' amended bill, show far more specifically in detail by their allegations the nature and extent of the business of the Kellogg Company, the Western Company, the American Company and its lessees, and the independent telephone companies, their relations to each other and the public, and the nature of the competition between the American Company or the Bell System and the independent telephone companies, including the Kellogg Company, up to January, 1902. All of these allegations referred to are, in the opinion of the court, substantially proven by the evidence.

The Everett-Moore Syndicate and the Kellogg Company, through Mr. DeWolf and its attorney, during December, 1901, had considerable negotiations in regard to the payment of the syndicate indebtedness to the Kellogg Company, and efforts to make arrangements by which the Kellogg Company's financial condition on account of this indebtedness would be relieved; but nothing was accomplished by these negotiations. And on January 2, 1902, the failure of this syndicate was publicly announced in the press, and the attorney of the Kellogg Company, who was down East at the time, where these negotiations were progressing, and who then had charge of them on the part of that company, about that date—I don't remember specifically the day on which the notice was given—notified Mr. DeWolf in substance that no arrangements as to the indebtedness of the Syndicate to the Kellogg Company could be made. Then and not until then the negotiations between Mr. DeWolf and Mr. Barton, and Mr. Fish through Mr. Barton, culminated, and resulted in the contract for the sale of the stock in question to Mr. Barton. This contract, omitting the attached statement referred to in it, is as follows: I will not take the time to read that, that is entirely familiar to counsel, and will only refer to certain parts of it.

The evidence shows that the purchase of said stock to the amount of about 4,311 shares was made by Mr. Barton for the American Company, acting through Mr. Barton and its

president, the defendant Fish, and was paid for by the funds of the American Company. The principal question presented is: Was the transaction illegal and void as being *ultra vires,* or against the public policy of Illinois?

The case was remanded by the supreme court, with directions to proceed in conformity with the views expressed by that court, and therefore those views are *res adjudicata* on the law, and binding on this court, in so far as applicable to the evidence in this case. The court says in its opinion, 224 Ill. at p. 22: If the American Company became the purchaser of said stock, with the unlawful purpose and intention of putting the Kellogg Company out of business, or so using and controlling it as to prevent rivalry in business and creating a monopoly, it called for an answer from the defendants. Also, if the American Company had purchased a majority of the capital stock of the Kellogg Company in its own name for the purpose of controlling the latter, and thereby preventing competition between itself and the latter corporation, the transaction would have been one which the courts of this state would not uphold. Citing *People v. Chicago Gas Trust Co.,* 130 Ill. 258, and other cases.

And the court also further held that the purchase by the American Company in the name of another would make the transaction illegal. Also, in commenting on whether the tendency of the purchase would be to suppress competition, it says (p. 23): "while a complete monopoly or a complete restraint of competition would not necessarily result, the tendency would be in that direction, which is sufficient to condemn the transaction as unlawful." Citing the Gas Trust case above referred to, and *Moore v. Bennett,* 140 Ill. 69, known as the Reporters' case. And in reference to the averment of the bill that it was the purpose of the American Company to suppress competition and create a monopoly, it says that it is further aided by the averment as to how Barton was to pay for the stock, and that the business of the Kellogg Company was to be carried on in the usual manner for one year. And further says that, these averments plainly indicate "that a dissolu-

tion of the Kellogg Company was contemplated, because in no other event could the Amercian Company appropriate the assets of the Kellogg Company to pay a stockholder of that company for the stock purchased by the former company from him.'' And says that the court had reached the conclusion— I quote the exact language: ''that the purpose and tendency of the purchase by the American Company are sufficiently shown by the bill to be to suppress competition by that company in telephone service to the public and create in the American Company a monopoly of that business.''

Further, in speaking of the American Company being a foreign corporation, the court held that it is subject to all the rules and regulations provided by the laws of this state, citing a number of cases, and the 26th section of the Corporation Act which so far as material here is as follows: ''Foreign corporations, and the officers and agents thereof doing business in this state, shall be subjected to all the liabilities, restrictions and duties that are or may be imposed upon corporations of like character organized under the general laws of this state, and shall have no other or greater powers.'' The court, speaking of the power of the American Company to purchase a majority of the stock of the Kellogg Company for the purpose of controlling it, held that it could not do it, and said—This is the direct language of the court: ''To permit it to do so would be against the law of this state and its public policy.''

It makes no difference now that the evidence shows that the American Company also purchased stock of another corporation, since under the Illinois statute, and the supreme court decisions, an Illinois corporation cannot purchase stock under the circumstances attending this purchase. And that, the court is of opinion, is fairly established by the *Gas Trust Case,* and others following since that, especially the *Glucose Case* in the 182nd Ill., I think the decision is reported in (*Harding v. American Glucose Co.,* 182 Ill. 551)

The language of the supreme court, by the use of the words ''purpose and tendency'' conjunctively, in several instances

which the court has referred to, and in others not referred to, when speaking of a question as to whether the purchase of the stock would have the effect of suppressing competition or creating a monopoly, would seem to indicate that "purpose" in that regard on the part of the purchaser should be shown in order to make the contract illegal.   This court is, however, of opinion, that such was not intended to be the ruling of the supreme court, for it, in effect, says, on page 23 of the opinion, that "tendency to create a monopoly or restrain competition is sufficient to condemn the transaction as unlawful."   And that is the holding of the supreme court in the *Gas Trust Case, Moore v. Bennett, Harding v. The American Glucose Company,* 182 Ill. 551, at pages 617 to 620, and the cases there cited. This court considers this ruling as *res adjudicata* as to the law of the case.   And if it can be said that the contract, considering the circumstances under which it was made, had a tendency to suppress competition, or create a monopoly, it is void as against public policy.   The allegations of the bill the court has referred to, regarding the circumstances under which the contract was made, being substantially proven, it follows that the supreme court's ruling must control in the decision of this case on this point.

The fact that the purchase gave the American Company the absolute control of the Kellogg Company, enabled it to prevent the selling of supplies by the Kellogg Company to independent telephone companies, to stop the business of the Kellogg Company, or even to dissolve the Kellogg Company, shows a natural and reasonable tendency to suppress competition and create a monopoly; though it is but just to the defendants in this connection to say that the Kellogg Company did not cease its sale of supplies to the independent companies, nor did it stop its business, and it has not been dissolved, but it has paid a dividend since this sale, upon its stock, of fifty per cent.   The court thinks there was a very wise and prudent conduct and management of the business of the Kellogg Company to avoid any evidence, so far as it possibly could, which would tend to establish the tendency of such a contract.

If the court, however, is wrong as to the scope of the supreme court decision in this regard, and that it is necessary that there should be shown purpose on the part of the purchaser of this stock, in order to make the contract illegal, that is, a purpose to suppress competition, or create a monopoly, the court is of opinion that the preponderance of the evidence shows such purpose on the part of the American Company. To review this evidence would require very much time, and it seems sufficient to make reference to the proof in a general way. The fact that there was a serious competition between the American Company, its lessee companies, and the Western Company, known as the Bell System, on the one part, and the independent telephone companies, of which the Kellogg Company was one of the principal independent manufacturing companies in the United States on the other part, when the nature and extent of the business of all these companies, as alleged in divisions 2 to 11, inclusive of the amended bill, and which have been substantially proven as heretofore stated by the court, are considered in connection with the terms of the contract of purchase, and the circumstances shown by the evidence as existing during the negotiations leading up to the purchase, especially the seriously involved financial condition of the Kellogg Company, and Milo G. Kellogg, his past activity in the Independent Telephone Movement for more than five years prior thereto, his opposition generally to the Bell System in his business and in the business of the Kellogg Company, the strong probability that this activity would not commence again for a long period, if at all, because of his bad state of health; that Mr. DeWolf was to be in charge of the Kellogg Company and had very friendly business relations with Mr. Barton and the Western Company; that the Everett-Moore syndicate, which was also on the verge of failure and largely indebted to the Kellogg Company, was a large independent telephone organization, which, if successful in its line of business would prove a strong competitor of the Bell interests; all of which matters are clearly established by the evidence—there seems to have been ample reason for saying there was a purpose on the part of the

American Company to place itself in a position, by this purchase, to suppress competition and build up a monopoly.

Also in addition to these matters, the court should not ignore the well recognized fact throughout the business world that with rare exceptions, the leading characters to which the court will omit names, who control large corporations or business interests are on the lookout continually by some means, whether direct or indirect, to absorb or overcome their competitors in trade. When this natural tendency of human nature is considered with all the other matters referred to, the conclusion as to purpose seems to the court a reasonable one, to use a mild term, notwithstanding the evidence as to the intention of the purchase by Mr. Barton and Mr. Fish to the contrary, and also notwithstanding the very exhaustive and able arguments of defendants' counsel.

Very soon after January, 1902, more than a year before the purchase was known to the public, of the making of the contract of purchase of the stock, the evidence shows that there was an effort by Mr. DeWolf and Mr. Barton to buy out the Stromberg-Carlson Company, the next largest independent manufacturing company of telephone apparatus, to the Kellogg Company; or, to put it more mildly, negotiations to purchase were started during the month of January, 1902, or about that time, though nothing was accomplished. That is a strong item of evidence in the court's opinion, tending to show a general purpose to suppress competition and get control of the then largest independent telephone manufacturing companies for the purpose of promoting a monopoly. Considerable evidence was also presented to the court of like efforts on the part of the American Company to make similar purchases as late as 1907, but the court regards it as quite remote in point of time, questions the competency of this evidence, and has therefore not considered it in reaching its conclusion on the matter of purpose of the American Company in making the purchase of the stock in question.

The court is of opinion that the contract, therefore, is void as against public policy of the state of Illinois, because the

preponderance of the evidence shows a purpose to suppress competition and create a monopoly in the line of business of the Bell System, though not a complete monopoly. And this purpose is in addition to the tendency of the contract to the same effect as has been stated by the court. In view of these conclusions, it seems to the court unnecessary to discuss the question of whether the contract was *ultra vires*, though that would seem, under the evidence and the rulings of the supreme court, under our statute—section 26 of the corporation act which has been quoted—to be settled in the affirmative.

A great mass of evidence was offered and admitted, subject to objection, by the court, both on behalf of the complainants and the defendants, regarding the manner in which the business of the Kellogg Company has been conducted since the purchase by the American Company of its stock; the extent of that business; its profits; the increase and decrease of certain parts of its business; as to certain patent suits between the Kellogg Company and its customers on the one part, and the Bell interests on the other part, both before and after the purchase of the stock; as to the foreign business done by the Kellogg Company both before and after the purchase, within the past two years mainly; also the purchase by leading employes of the Kellogg Company of the Western Company's stock, the Kellogg Company loaning them more than $57,000 in order to enable the employes to make their purchases; and negotiations between Mr. DeWolf and one Judge Thomas, in regard to the Kellogg Company entering into a combination with certain independent telephone companies; all of which it is claimed has a bearing on the question of purpose and intention of the American Company in making the purchase of the Kellogg Company's stock. The court had some doubt as to the competency of all this evidence, because a great deal of it was with regard to matters quite remote from the transaction in question and not necessarily having any bearing upon it. It may be that many of the things shown were done because of purposes or intentions formed after the purchase of the stock in question; and if so, they would have no bear-

ing on the transaction. And for that reason, namely, that it was not necessary to the result reached by the court as to the tendency of the purchase, to consider purpose and intention, the court has not considered the items of evidence last above referred to, as should have been done had the court thought that the decision of the case depended wholly upon the purpose or intention of the American Company in making the purchase. It is contended by defendants' counsel that the amended bill contains no allegation as to tendency, and therefore that no relief can be granted under the pleadings. This contention, in the court's view, is not tenable, for the reason that as has been stated, facts are alleged which the court is of opinion clearly show the tendency of the purchase, and it was so decided by the supreme court.

It was contended by defendants' counsel that allegations of the amended bill, in effect, charge the commission of a crime on the part of the defendants, and therefore that the allegations of the bill must be proven beyond all reasonable doubt, before any relief could be based thereon. It is unnecessary to pass upon this point, for the reason that the court's ruling is as to the tendency and purpose of the purchase, and that does not amount to a crime, but only shows that the transaction is void as against public policy.

The court on the hearing took notes of the evidence and arguments of counsel, in an abbreviated form, which if written out would make about 125 typewritten pages, all of which it has carefully considered since the arguments closed, and it has also read such parts of the pleadings and evidence as were necessary to refresh its recollection. Reference has not been made to many points of the arguments of counsel, nor to the details of the evidence, but all have been carefully considered, and the conclusions reached thereafter. The court makes this statement to assure counsel that the importance of the case has been appreciated, and nothing presented has failed to receive the consideration of the court by reason of carelessness or willful negligence.

The transaction in question being void, if the court is right

in its ruling in that regard, it follows that no title to the stock passed, and Milo G. Kellogg and the other sellers of stock under the Barton contract are still the owners of the stock under the law. The decision of the supreme court controls as to Milo G. Kellogg's rights to any relief under the cross-bill, it being based upon alleged fraud, and there was no offer in the cross-bill to place the purchaser in *statu quo*. It is true, the court says: "The contract is not void, but only voidable at the election of the defrauded party." But this must be construed with reference to the relief asked in the cross-bill being based upon alleged fraud, and has no bearing on the complainants' rights under the amended bill, which depend upon the situation as to them. The supreme court holds, on page 26 of the opinion that the invalidity of the purchase is sufficient to entitle complainants, as minority stockholders, to have the American Company restrained from voting the stock purchased by it, and thus controlling the Kellogg Company. This right of complainants exists, notwithstanding the adjudication of the supreme court on the cross-bill, based on its allegations of fraud in bringing about the purchase. If the transaction between the American Company and Milo G. Kellogg and other sellers of the stock is void as held, the complainants are entitled to relief that should be granted on the basis of their equities, although the result may indirectly be a benefit to Milo G. Kellogg and other sellers of stock and an injury to the American Company. Complainants' relief should not be limited on this account, but should be granted on such conditions as will cause the least injury to the parties concerned in the transaction and at the same time give them their equitable rights. To protect the complainants and do equity to them, they are entitled to have restored, so far as possible, the situation as it was before the purchase of the stock, and in so far as a change has resulted from that sale. This can be accomplished by requiring the American Company to bring the stock in question into court, together with all dividends paid thereon, with interest at five per cent per annum from the times of payments respectively of such divi-

dends, and the return of the stock to Milo G. Kellogg and to others that sold to the American Company under the Barton contract, upon their paying to the American Company the prices paid them for this stock, with interest at five per cent per annum from the times when said payments, respectively, were made to them. 'In case the sellers, or either of them, should fail to make return of the purchase prices of stock with interest as stated, within thirty days from the entry of the decree, then the decree should provide that the stock be sold under the direction of the court, say one-half cash, and balance in six months from sale, with interest at five per cent per annum, such balance to be secured by a deposit of the stock with the clerk of this court as security. Pending the making of such payments the business of the Kellogg Company should be conducted by the present administration of that company, or its president should act as a receiver of the court, of course giving large and ample bond, which I think in this case should not be less than $100,000; and the annual meeting of the stockholders should be adjourned under the terms of the decree of the court until said payments are made, or, in default thereof, until a sale of said stock shall be made and perfected, as indicated.

In case of failure of any seller of the stock to pay the purchase price of his stock to the American Company within thirty days from the entry of the decree, then the proceeds of the sale of that specific stock should be paid to the American Company to the extent of the purchase price paid by it for such stock, and interest at five per cent. per annum from the dates at which the American Company paid such seller for such stock. If there should be any surplus on the sale of the stock over said price paid by the American Company and interest, it should be paid to the seller of said stock—I refer, by the seller, to the American Company, under the Barton contract,—said dividends and interest thereon, as if paid into court, should be paid over to the seller of said stock, after deducting therefrom any deficit from the purchase price of said stock, as paid by the American Company, and interest

thereon, which may result from the sale of the stock, under the order of the court.

The court is inclined to the view that the facts alleged in the amended and supplemental bill and as has been stated were proven, and the fact that the bill has a prayer for general relief, would justify a decree as indicated, except as to the receiver, which is suggested, not because there seems to be an absolute necessity for one, but to avoid, so far as possible, any friction that may arise, pending a closing up of the decree, or pending an appeal, which may be taken from this court, as has already been suggested by counsel on both sides. If the complainants desire a receiver, the court is of opinion there should be an amendment to the pleadings, and perhaps additional proof even, which would be justified because of the injunction which has already been granted temporarily, and the apparent financial responsibility of the parties in control of the Kellogg Company, and especially in view of the financial success of that company since it has been under their control.

One part of my notes I failed to give, and that is this: The American Company and its representatives should by the decree, and pending its accomplishment, be enjoined from in any manner interfering with the management or conduct of the business of the Kellogg Company, and the temporary injunction, granted February 13, 1907, should be made final, except as in some of its provisions it may conflict with the decree here indicated by the court.

If a decree is to be entered on the pleadings, as they now are, it may be drafted, declaring the sale of the stock void, as against the public policy of this state, and setting it aside; and also in accord with the court's rulings, as has been indicated, omitting the receiver. If counsel for defendants, they having declined in the oral argument to discuss any decree except one denying complainants any relief, are of opinion that the decree directed by the court is not proper, under the court's rulings, and in view of the evidence and the pleadings, the court will consider anything they desire to say on that

subject at the criminal court next Tuesday morning at 8:45. If counsel cannot present their views, if they desire to present any on that point, why then they can prepare a brief in three days on the question of the form of the decree only.